**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **QUANTLAB GROUP, LP, and** | § | |
| **QUANTLAB FINANCIAL, LLC,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 4:18-cv-02171** |
| | § | |
| | § | **JURY TRIAL DEMANDED** |
| **ALLEN HERMAN DEMPSTER and** | § | |
| **DEMPSTER & DIETLER, LLP,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Quantlab Group, LP and Quantlab Financial, LLC (collectively "Quantlab") bring this action for temporary and permanent injunctions to prohibit Defendant Allen Herman Dempster, an attorney and accountant, and his firm, Dempster & Dietler, LLP, from consulting with Bruce P. Eames, Andrey Omeltchenko, or any of their affiliated persons or entities, including attorneys, with respect to matters on which Mr. Dempster and his firm have previously acted as attorney, accounting and/or tax advisor for Quantlab, and to recover damages resulting from their betrayal of their former clients, breaches of professional conduct and fraud.

## <u>PARTIES</u>

1.     Quantlab Group, LP is a Delaware limited partnership.  Its principal place of business is in Houston, Texas.

2.     Quantlab Financial, LLC is a Delaware limited liability company registered to do business in Texas.  Its principal place of business is in Houston, Texas.

3.       Allen Herman Dempster is a resident of Walnut Creek, California.  His business address is 500 Ygnacio Valley Road, Walnut Creek, California 94596.  Dempster has appeared and answered herein.

4.       Dempster & Dietler, LLP is upon information and belief a California limited liability partnership with its principal place of business in Walnut Creek, California.  Its business address is 500 Ygnacio Valley Road, Walnut Creek, California 94596.Dempster & Dietler, LLP has appeared and answered herein.

5.       The activities of Allen Herman Dempster that are described in this Complaint were committed on his own behalf and on behalf of Dempster & Dietler, LLP in the course and scope of his employment at that firm.  Dempster & Dietler, LLP is liable for the conduct of Allen Herman Dempster to the full extent of the law, including the disgorgement of any fees paid to Dempster & Dietler, LLP in connection with the acts and omissions described in this Complaint.

## JURISDICTION

6.       This court has jurisdiction of this case pursuant to 28 U.S.C. §1332 because the dispute is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00 exclusive of interests and costs.

## VENUE

7.       Venue is proper in this court pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to the claim occurred within the Southern District of Texas.

## FACTS

8.       Dr. W. E. "Ed" Bosarge (Bosarge) is a renowned pioneer in the application of advanced mathematics.  A Fulbright Scholar, Bosarge earned B.S. and M.S. degrees in applied mathematics from Georgia Tech and a Ph.D. in that field from Brown University.  Bosarge has

worked in space technology, energy, medicine and finance, developing new and revolutionary technologies in each field.

9.    In the 1980s and early 1990s, Dr. Bosarge developed mathematical models that could predict the behavior of financial markets and enhance the yield of large, fixed-income portfolios.  He published more than 20 scientific papers on mathematical solutions to financial modeling problems.  Bosarge launched a business now known as Quantlab, which is recognized today as one of the world's largest and most successful high frequency trading firms.  Quantlab Group LP serves as the holding company for the high-frequency trading firm.  Quantlab Financial, LLC is a wholly owned subsidiary of Quantlab Group, LP.  Quantlab Financial, LLC provides research, technology and administrative functions for Quantlab Group, LP and various companies owned by Quantlab Group, LP.

10.    Quantlab Group, LP has one general partner named Quantlab Group GP, LLC, a Delaware limited liability company.  Bosarge-related entities own approximately 72% of the limited partner interests in Quantlab Group, LP and 75% of Quantlab Group GP, LLC, the general partner of Quantlab Group, LP.

11.    Bruce P. Eames ("Eames") joined Quantlab in 1997.  Eames and related entities now own directly or indirectly approximately 23% of the limited partner interests in Quantlab Group, LP and 25% of the general partner interests of Quantlab Group GP, LLC.

12.    Andrey Omeltchenko ("Omeltchenko") joined Quantlab in 1998.  Omeltchenko and related entities now own directly or indirectly approximately 4% of the limited partner interests in Quantlab Group, LP.

13.    Defendant Allen Herman Dempster ("Dempster") and his firm, Dempster & Dietler, LLP ("Dempster & Dietler") have been engaged to represent, provide legal counsel and

act as attorney, accounting and tax advisors for Quantlab principals and entities for many years. Mr. Dempster has represented, and performed significant legal, accounting and tax services for, among other relevant players, Quantlab Group, LP, Quantlab Financial, LLC, Quantlab Technologies, Ltd., Quantlab Europe, B.V., Quantlab's in-house investment advisers, Quantlab's trading entities, and Quantlab's intellectual property holding companies. Mr. Dempster has also represented and performed significant legal and accounting services for Bosarge and Bosarge-related entities, Eames and Eames-related entities, and Omeltchenko and Omeltchenko-related entities. These include without limitation Marco, LP and Veloce, LP (both Bosarge-related entities and Quantlab Group, LP limited partners): AVG Holdings, LP and 5D Holdings, LP (both Eames-related entities and Quantlab Group, LP limited partners); AVG GP, LLC (the general partner of AVG Holdings, LP); and Aster Securities (US) LP (an Omeltchenko-related entity and Quantlab Group, LP limited partner). Mr. Dempster has performed extensive legal work over many years for Bosarge and his family. He has also been the key strategist and architect of the organization, ownership and control structure of the entities that own and comprise Quantlab. As part of that work, Dempster set himself up as one of the initial managers of Quantlab Group GP, LLC.

14.    Mr. Dempster also served as legal, accounting and tax advisor in the formation and operation of Quantlab Trading Partners US, LP ("QTPUS") and Quantlab Incentive Partners II, LLC ("QIP II"), both of which are Quantlab-associated entities. After creating these entities and while continuing to represent Quantlab in myriad other capacities, Mr. Dempster went into business with Quantlab, becoming a limited partner in QTPUS and a member of QIP II. Agreements between counsel and their clients during the course of the attorney-client relationship as existed here are closely scrutinized, and Dempster has the burden of proving that these transactions are fair and reasonable and comply with the applicable rules. This, Dempster cannot

do.  Rather, Dempster violated his fiduciary duties in connection with these business ventures, improperly receiving approximately $7.2 million attributable to his participation in QTPUS and approximately $4.1 million from his participation in QIP II.

15.     Affirming the depth and breadth of his role as attorney for Quantlab, its principals and affiliates, Dempster wrote an August 18, 2017 letter to the Dutch Central Bank in connection with Quantlab's application for a European trading license, in which he said:

> "I am one of the United States legal counsel for the Quantlab Group, LP ("QLG") and the person responsible for drafting the limited partnership agreement, and related amendments thereto of QLG and likewise the person responsible for structuring of the ownership and management of the various underlying direct and indirect subsidiary companies of QLG . . . and I was likewise either the drafter of or involved in the drafting of the various limited partnership agreements for each of 5D holdings, LP, AVG holdings, LP, Marco, LP, and Veloce LP."

16.     In addition to these responsibilities, on July 5, 2017, Dempster accepted a position as a Senior Tax Advisor at Quantlab CA, Inc., a wholly owned subsidiary of Quantlab Financial, LLC.  He executed an employment letter dated June 30, 2017 containing the following written commitment of loyalty and confidentiality:

> *"Employee Loyalty, Confidentiality, Inventions and Non-Solicitation, and Agreement:*  The position being offered involves working with valuable confidential information of the Company and its affiliates.  This offer is conditioned upon your execution of the Quantlab Financial, LLC Employee Loyalty, Confidentiality, Inventions and Non-Solicitation, Agreement ("Agreement") which is being provided with this offer letter.  You may not start work at the Company until this Agreement has been signed.  This Agreement contains an "inventions" assignment clause, and it is acknowledged that all software, inventions, strategies, discoveries, etc., made by an employee during employment are the property of the company.  The agreement may be updated from time to time as a condition of continued employment.  In addition, you will agree to keep all terms of this offer letter confidential."

17.     Dempster was provided with a copy of the Quantlab Financial, LLC Employee Handbook, which prescribes in detail that use or disclosure of Quantlab's confidential or proprietary information is prohibited.  Dempster is bound by these restrictions in addition to the

absolute duties of fidelity, confidentiality and loyalty incident to his roles as attorney, accountant and advisor for Quantlab companies, principals and affiliates.

18.    Dempster prepared the original limited partnership agreement for Quantlab Group, LP, which was executed on August 27, 2008.  An amendment to this agreement was executed on February 25, 2009.  On November 30, 2010, the parties executed an "Amendment and Complete Restatement" of the limited partnership agreement.  This instrument was also amended several times on July 24, 2015 (the "Second Amendment"), December 31, 2015 (the "Third Amendment"), and July 8, 2016 (the "Fourth Amendment").  The operative limited partnership agreement for Quantlab Group, LP is the Fourth Amendment and Complete Restatement of the Agreement of Limited Partnership of Quantlab Group, LP, a Delaware Limited Partnership dated July 8, 2016.[1] Dempster either prepared, was involved in preparing, or provided legal advice and counsel to the Quantlab principals regarding all these agreements.

19.    On February 25, 2009, holders of Class A limited partnership interests in Quantlab Group, LP purported to enter into a Voting Trust Agreement.[2]  The six signatories to the 2009 Voting Trust Agreement included interests owned by or related to Bosarge, Eames and Omeltchenko.  Collectively, the signatories to the 2009 Voting Trust Agreement owned approximately 96% of the Class A voting limited partnership interests in Quantlab Group, LP.  The 2009 Voting Trust Agreement provided for a voting trustee who would vote the block of Class A limited partnership interests according to the direction of a three-member Voting Trust Committee. The members of the Voting Trust Committee were Bosarge, Eames and Omeltchenko.  Under the

---

[1] [1] The First Amendment to Fourth Amendment and Complete Restatement of the Agreement of Limited Partnership of Quantlab Group, LP became effective on July 24, 2018.  As of the date of filing, the Fourth Amended LPA with the July 24, 2018 amendment remains the operative agreement for Quantlab Group, LP.
[2] There is a dispute as to whether this Voting Trust Agreement is valid or was void from its inception, but such disputes are not germane for the context of the present matter.  This allegation is without prejudice to the rights of any party to the voting trust to challenge the validity of the Voting Trust Agreement, which is the subject of other litigation.

Voting Trust Agreement, the Voting Trust Committee was to act by majority vote, each member having a 1/3 vote. Thus, although Bosarge related entities own approximately 72% of the limited partner interests in Quantlab Group, LP, the 2009 Voting Trust Agreement purported to reduce Bosarge's ability to exercise the voting rights of those limited partner interests to 33 1/3%. Dempster was one of the architects of the 2009 Voting Trust Agreement and he was relied upon to provide legal and accounting advice and counsel to the Quantlab companies and principals, including Bosarge, Eames, Omeltchenko, Quantlab Group, LP and Quantlab Financial, LLC as to its meaning, terms and effects.

20.    In 2010, the 2009 Voting Trust Agreement was purportedly amended and restated in a 2010 Voting Trust Agreement.[3]  This Agreement was also signed by the holders of the Class A limited partner interests owned by or related to Bosarge, Eames and Omeltchenko.  Dempster was involved in the preparation and execution of the 2010 Voting Trust Agreement and he was relied upon to provide legal and accounting advice and counsel about the Agreement to the Quantlab companies and principals, including Bosarge, Eames, Omeltchenko, Quantlab Group, LP, and Quantlab Financial, LLC.

21.    Throughout the course of his relationships with the Quantlab companies and principals, Dempster has had access to Quantlab's most closely guarded confidential information, trade secrets, business strategies and practices.  He received and worked with the most intimate personal information, goals and concerns of the Quantlab principals, and he obtained detailed knowledge regarding their personal and business interrelationships.  He was relied upon to develop the intricate business structure that forms the framework for the operation of the Quantlab companies.  Indeed, most of the partnership documents, voting trust agreements and other

_____

[3] The dispute referenced in footnote 1 above applies equally to the 2010 Voting Trust Agreement.

instruments that are now made the subject of various lawsuits between the limited partners in Quantlab Group, LP were either authored by Dempster or prepared under his guidance, and all of them were executed upon his advice as to their terms, contents, meaning and effect.  As an attorney engaged to provide legal services, and as an accountant having the unwavering trust and confidence of his clients, Dempster was relied upon and had the absolute duty to keep all this information confidential, and not to use or disclose it to the detriment of his clients.  This lawsuit is necessary because, among other things, Dempster has completely abrogated and forsworn this duty and he continued to do so despite demands that he stop.

22.    On October 2, 2017, Dempster resigned from Quantlab effective October 31, 2017. In an email addressed to Bosarge, Eames and Omeltchenko on that date, Dempster announced his resignation and said:

> "It has been a true honor and the highlight of my professional career to be a part of the Quantlab experience and I am immensely proud of all of the things we have accomplished.  I will be eternally grateful for the life that I have had (and will continue to have) and the things that I have been able to do for my family as a result of your generosity.  THANK YOU VERY MUCH FOR THE FINANCIAL SECURITY THAT, BECAUSE OF YOU, I HAVE BEEN ABLE TO ATTAIN."

23.    Dempster didn't mention that at that time he was and had been conspiring with Eames and Omeltchenko and advising them as to the means by which they could steal control of Quantlab Group, LP and wage a legal war for dominance affecting the entire Quantlab group of companies.  Their plan was to execute a surprise *coup d'état* by attempting to oust Quantlab Group, LP's general partner, Quantlab Group GP, LLC, which Bosarge managed, and purporting to install a new general partner, named Quantlab Group GP II, LLC, which was owned and controlled by them.  Since Quantlab Group, LP had only one general partner and the limited partners have little influence over the operation or control of the partnership other than the admission or removal of the general partner, this scheme would have the effect of placing control of the Quantlab group of

companies in the hands of Eames and Omeltchenko, under Dempster's advice, encouragement and counsel. Dempster, Eames and Omeltchenko kept their plan secret and failed to tell Bosarge or anyone at Quantlab anything about it.

24.     It has recently been discovered that while Dempster was Quantlab's attorney and on Quantlab's payroll, Dempster was, among other things:

- secretly meeting and conspiring with Eames and Omeltchenko "for weeks" to devise a scheme to defraud Quantlab and take control over the Quantlab businesses;

- leaking Quantlab's privileged and confidential information to Eames and Omeltchenko and their counsel, who were adverse to Quantlab, to use against Quantlab;

- disclosing intimate inside information about Quantlab, including "how the Voting Trust Agreement worked in relation to the Limited Partnership Agreement for Quantlab Group" to plan the coup;

- intentionally and fraudulently manipulating and misinterpreting the Quantlab agreements that Dempster drafted against Quantlab's interest to facilitate the coup;

- planning a secret meeting of the "Voting Trust Committee" where Mr. Eames, as the 25% owner, would take away control of the Quantlab business from Dr. Bosarge, the 75% owner, and that Dempster was to be appointed as the "Voting Trustee" to cast the vote to make it happen;

- secretly communicating with Eames and Omeltchenko, and their other counsel, to encourage, advise, and participate in the structuring and drafting of the take-over documents, including agreements, resolutions, notices, and all other documents

needed for the "removal and replacement" of the existing General Partner (Quantlab GP), which was Dempster's actual client, and replacing it with a substitute general partner owned and controlled by the conspirators, in order to defraud his client and implement the coup;

- deliberately withholding, concealing, and failing to disclose material facts that Dempster had a fiduciary duty to disclose to his client, Quantlab, including but not limited to the facts and circumstances concerning: the impending *coup;* the breaches of duty by the conspirators; Dempster's communications with his co-conspirators' counsel against Quantlab; Dempster's communications with his co-conspirators against Quantlab; Dempster's serious conflicts of interest; the preparation of documents for the "removal and replacement of the General Partner;" Dempster's role in the encouragement, counseling, preparation and review of the documents necessary for the "removal and replacement" of the General Partner; the secret meeting of the Members of the Voting Trust Committee; the secret vote of the Voting Trust Committee; his resignation, including that it was motivated by his intent to represent his conspirators against Quantlab; the improper leaking and disclosure of Quantlab's privileged and confidential information to Quantlab's adversaries; and other material facts; and

- anticipating litigation against his own client.

25.    On November 6, 2017, the conspirators put their plan in motion.  Eames and Omeltchenko, acting as a majority of the Voting Trust Committee, executed a written consent appointing Dempster as the Voting Trustee.  In the same instrument, Eames and Omeltchenko instructed Dempster, their new stooge Voting Trustee, to vote the Class A limited partner interests

subject to the Voting Trust in favor of admitting Quantlab Group GP II, LLC as the new general partner and removing the existing general partner, Quantlab Group GP, LLC.[4]  Eames also executed a written consent to the admission of Quantlab Group GP II, LLC, purporting to act in the capacity as a manager of Quantlab Group GP, LLC.  Although all this was done under the purported authority of the 2009 Voting Trust agreement with Dempster acting as Voting Trustee, there was no notice to Bosarge, as a member of the Voting Trust Committee of any intended meeting or vote of the purported Voting Trust Committee.

26.    Despite his fiduciary duties to disclose all material facts concerning Quantlab's businesses which were within the course and scope of his actual representation of Quantlab, Dempster did not breathe a word about any of the foregoing to his client, Quantlab.  Dempster deliberately failed to disclose these and other materials facts that he had a duty to disclose to Quantlab to prevent Quantlab from learning the truth and stopping the *coup*.

27.    Eames and Omeltchenko contemporaneously filed a lawsuit styled *Eames, et al. v. Quantlab Group GP, LLC, et al.;* C.A. No. 2017-0792-JRS in the Court of Chancery of the State of Delaware ("Delaware I"), seeking an order declaring that the actions taken during their *coup* attempt were valid corporate acts. They admit that Dempster advised them as their attorney in formulating and executing these events.  They admit that Dempster continued to serve as legal advisor to Eames and Omeltchenko during the course of the lawsuit.  They even admit that he participated in the preparation of documents related to the lawsuit.  As part of that lawsuit, Eames and Omeltchenko named Quantlab Group, LP as a defendant.  They also issued a subpoena *duces tecum* directing Quantlab Financial, LLC to retrieve and produce an extensive array of data, including documents related to other subsidiaries within the Quantlab group of companies.  This

---

[4] Indeed, this was the first time anyone purported to act in the capacity of Voting Trustee; in all prior interactions, the Class A limited partners voted their own interests as if there were no voting trust.

necessitated that both Quantlab Group, LP and Quantlab Financial, LLC engage counsel. Quantlab Financial, LLC incurred substantial costs to undertake a massive effort to search various conventional and electronic databases and to develop a procedure for the production of that material.

28.     The Delaware Chancery Court had little trouble rejecting their claim. On May 1, 2018, Vice Chancellor Joseph R. Slights, III issued an opinion, followed by an Order and Final Judgment entered May 4, 2018, in which he held:

> "The November 6, 2017 written consents purporting to admit Quantlab Group II, LLC as a General Partner of Nominal Defendant Quantlab Group, LP and purporting to remove Quantlab Group GP, LLC as the General Partner of Quantlab Group, LP are unenforceable and without legal effect because they violate the operative Limited Partnership Agreement of Quantlab Group, LP and the operative Limited Liability Company Agreement of Quantlab Group GP, LLC and, therefore, Quantlab Group GP, LLC remains as the sole General Partner of Quantlab Group, LP."

29.     Undeterred by the Delaware Court's refusal to validate their unlawful scheme, Eames and Omeltchenko, supported by encouragement, advice and counsel from Dempster, waived their right to appeal and, instead, sought a second bite at the apple and filed a new lawsuit in Cause No. 2018-36811; *Bruce Eames, et al. v. Marco, LP, et al.*; in the 333rd Judicial District Court of Harris County, Texas (the "Texas State Court Case"). This new lawsuit was filed in Harris County, Texas despite the fact that Quantlab Group, LP is a Delaware entity, the Voting Trust Agreement is governed by Delaware law, and they had already sought to involve the Delaware Chancery Court in the examination and analysis of the corporate documents forming the basis for their claims. Almost certain that the Delaware Chancery Court would rule against them, Eames, Omeltchenko and Dempster turned to the Texas courts to assist them in their continued efforts to wrestle control of Quantlab Group, LP. In their new lawsuit, Eames and Omeltchenko are seeking a declaratory judgment that the Voting Trust Agreement remains effective and continues to govern

the Quantlab Group, LP Class A limited partnership interests described in the Voting Trust Agreement. This is a contested hypothesis in that the defendants to that lawsuit assert that the Voting Trust Agreement has been abandoned, is not applicable to the Fourth Amended Limited Partnership Agreement and is otherwise void and unenforceable.[5] On May 15, 2019, the Judge in the Texas State Court Case recognized that this issue was already in front of the Delaware Court and abated this case.

30.      In another related case, styled *Quantlab Group GP, LLC, et al. v. Bruce P. Eames, et al.;* C.A. No. 2018-0553-JRS, in the Court of Chancery of the State of Delaware ("Delaware II"), the Delaware Court was asked to determine what effect, if any, the Voting Trust Agreement had on the Fourth Amendment Limited Partnership Agreement ("LPA"). On March 19, 2019, Vice Chancellor Joseph R. Slights, III, answered that question in his opinion granting Quantlab's motion for summary judgment, finding that the Voting Trust Agreement has no impact on the LPA. As such, the Voting Trust Agreement cannot be used to modify, alter or supplement the LPA, nor can it be used as a vehicle to remove Quantlab LP's general partner in a manner inconsistent with the LPA as was attempted in the failed November 6, 2017 *coup*. While a Final Judgment is anticipated to be entered shortly in the Delaware II Case in Quantlab's favor and against Eames and Omeltchenko, the Delaware Court noted his disapproval of the Eames and Omeltchenko parties' gamesmanship and attempt to circumvent the Delaware Court's decision in Texas. Specifically, Vice Chancellor Slights stated:

> One final note that I feel compelled to share here after having read the submissions. And I'll say, I've read with some concern some of the filings in the Texas litigation that were attached to the filings here. And I say "concern" because it always concerns me when I see litigants who appear at least to be attempting to play one court off another or one judge off another. So I think it's important to be clear here.

---

[5] This is a position echoed by the Delaware Chancery Court. The Court found the argument that the parties abandoned the Voting Trust Agreement during negotiations and superseded it by amending the Limited Partnership Agreement to be "persuasive."

The defendants, which I'll refer to as the Eames-Omeltchenko faction, started this fight between the parties here in Delaware, presumably because the dispute involved contested control of the Delaware entity under Delaware law. They litigated that dispute not in arbitration but in this court and they lost. They then went to Texas to fight Chapter 2 there. When the plaintiffs here, who I refer to as the Bosarge faction, cried foul, I initially said that I thought they protested too much. I said that because the defendants here told me the dispute in Texas did not involve contested control of this Delaware entity, which was the very issue we had just litigated fully and to conclusion not months before, and also because I had no doubt, and still have no doubt, that the Texas judges could decide the matter as well, if not better, than I could. But then the plaintiffs here came back and they pointed out that the Texas plaintiffs had represented to the Texas court that the case there was, in fact, about who should control Quantlab. In other words, it appeared, at least to me, that the Texas plaintiffs wanted to litigate again in Texas what they had just litigated and lost in Delaware.

31.     Despite the Delaware Court's admonishment, on July 19, 2019, the "Eames-Omeltchenko faction" yet again filed another lawsuit in Texas, styled *Aster Securities (US), LP, et al v. Bosarge* ("Texas II"). In Texas II, the Eames-Omeltchenko faction are seeking damages in excess of $1 million claiming they were allegedly fraudulently deprived of their right to take over control of the Quantlab businesses, which the Delaware Court has twice said they had no right to do.

32.     In violation of his fiduciary and ethical duties, Dempster has been in the forefront of this continuing war for control over the Quantlab entities, providing encouragement, consultation, confidential information and advice to Eames, Omeltchenko and their legal counsel in the prosecution of this fight. For instance, throughout October 2017, while Dempster was Quantlab's actual attorney and accountant, Dempster provided legal advice and strategy to Quantlab's adversaries, and secretly sent emails, participated in conferences, leaked Quantlab's privileged and confidential information, and worked on drafting and reviewing agreements and documents for Eames, Omeltchenko and their Delaware counsel, Thad Bracegirdle, an attorney at Wilks, Lukoff & Bracegirdle, LLC, all against Quantlab's interest. After October 31, 2017, Dempster continued his vendetta against Quantlab, his former client, violating his fiduciary duties

14

by disclosing Quantlab's privileged and confidential information and providing legal advice and strategy to Quantlab's adversaries on how to vanquish Quantlab in the ongoing litigation which was based on the same matters as Dempster's prior representation of Quantlab.

33.    Although actively working against his client Quantlab, Dempster remained in business with Quantlab as a partial owner of QTPUS continuing to reap the benefits of his interest while simultaneously breaching his fiduciary duties to Quantlab.

34.    This series of lawsuits, Dempster's central role in them, and his breaches of fiduciary duties and fraud have been and remain extraordinarily disruptive to Quantlab and its business.  This has caused Quantlab Group, LP and Quantlab Financial, LLC to engage attorneys to protect their interests in the litigation that has been filed and almost undoubtedly will be filed in the future.  This has caused Quantlab Group, LP to indemnify Quantlab Group GP, LLC for the costs incurred in successfully fighting the improper attempted removal of Quantlab Group GP, LLC.  This has caused deterioration in employee morale and has damaged Quantlab's business goodwill.  This has also caused and will continue to cause delays and interruption in the development and expansion of Quantlab's business, resulting in substantial financial harm.  Having acted for many years as an attorney and trusted accounting advisor counseling Quantlab principals and entities, including Quantlab Group, LP and many of its subsidiaries, Dempster has a legal and professional duty not to represent some parties within that group against others.  Dempster's professional misconduct is unlawful and must be stopped.

## CAUSES OF ACTION

## COUNT I – BREACH OF FIDUCIARY DUTY

35.    Quantlab repeats and realleges each of the allegations contained in paragraphs 1 through 34 as if set forth fully herein.

36.     Attorneys owe fiduciary duties to clients as a matter of law.  *Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex. 1988).  This means that the attorney-client relationship is one of most abundant good faith, requiring absolute perfect candor, openness and honesty, and the absence of any concealment or deception.  *Goffney F. Rabson,* 56 S.W.3d 186, 190-94 (Tex.App.—Houston [14th Dist.] 2001, pet.  denied).  In particular, an attorney's fiduciary duty includes the duty to preserve client confidences and not to use or disclose information obtained during the course of an engagement against the client in a subsequent matter.  It also includes the duty not to engage in proceedings in which the interest of one client conflicts with that of another.  *National Medical Enterprises, Inc. v. Godbey,* 924 S.W.2d 123 (Tex. 1996); *Wilson P. Abraham Construction Corp. v. Armco Steel Corp.*, 559 F.2d 250 (5th Cir. 1977)(per curiam); *Westinghouse Electric Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311 (7th Cir.), *cert denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 345 (1978); *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton,* 96 Cal.App.4th 1017; 117 Cal.Rptr.2d 685 (2002); *Adams v. Aerojet-General Corp.,* 86 Cal.App.4th 1324; 104 Cal.Rptr.2d 116 (2001).

37.     Dempster and Dempster & Dietler, LLP also owe the fiduciary duties of an accountant to the plaintiffs.  Their fiduciary duties arise out of the complete trust and confidence reposed in them by the Quantlab principals and entities during the course of a close business and personal relationship over many years, and Dempster's knowledge that he and his firm were being relied upon for advice and counsel, to respect the confidentiality of information disclosed to them, and to protect the interests of their clients.  *See, e.g., Estate of Abernethy,* 390 S.W.3d 431 (Tex.App.—El Paso 2012, no pet.).

38.     Dempster breached his fiduciary duties owed to Quantlab both as Quantlab's current and former counsel.  Dempster breached his duties of honesty, trust, fidelity, and loyalty

by, among other things, engaging in a conflict of interest through overlapping representations by secretly conspiring with Eames and Omeltchenko against Quantlab at the same time he was actually representing Quantlab, serving as Eames and Omeltchenko's legal advisor against Quantlab in the substantially related Delaware I Case, misinterpreting and calling into question in the Delaware I and II and the Texas State Court Cases documents and agreements Dempster authored or which were prepared under his guidance and all of which were executed upon his advice as to their terms, contents, meaning and effect, and improperly representing joint clients against each other on the identical subject matter. By sharing Quantlab's privileged and confidential information with Eames and Omeltchenko, to which they were not entitled, and working against the interests of Quantlab, his existing client, Dempster clearly breached his fiduciary duties of loyalty, confidentiality, and fidelity. *See, e.g.,* Texas Disciplinary Rules of Professional Conduct Rule 1.06(b).

39.     Dempster continued to breach his fiduciary duties to Quantlab after his resignation by leaking Quantlab's privileged and confidential information and consulting with, aiding, assisting and encouraging Eames and Omeltchenko on matters with respect to which he was also previously engaged by other Quantlab principals and entities, including Quantlab Group, LP and Quantlab Financial, LLC. Dempster's attorney-client relationship was with Quantlab, and Quantlab did not authorize Dempster to share its privileged and confidential information with Quantlab's adversaries or those adversaries' counsel. Dempster's disclosure of Quantlab's privileged and confidential information and his irreconcilable conflict of interest are classic examples of Dempster's unlawful and impermissible breaches of fiduciary duty owed to Quantlab, his former client. *See, e.g.,* Texas Rules of Professional Conduct, Rules 1.05(b)(3), 1.06(d), and 1.09 (duties owed by lawyers to former clients). *See also* MODEL RULES OF PROF'L

CONDUCT R. 1.9 & cmt.  1 ("After termination of a client-lawyer relationship, a lawyer has certain continuing duties with respect to confidentiality and conflicts of interest and thus may not represent another client" if it would violate either ongoing duty).

40.    Dempster has also breached his fiduciary duties by entering into business transactions with Quantlab which were not fair and reasonable, and which did not comply with the basic requirements for attorneys who go into business with their clients. *See, e.g.,* Rule 1.08 Texas Disciplinary Rules of Professional Conduct.[6] For instance, in connection with QTPUS and QIP II, Dempster either authored the operative documents or they were drafted under his guidance.  All of the relevant documents were then executed based upon his advice as to their terms, contents, meaning and effect.  Yet Dempster wholly failed to fully disclose the terms of these transactions and did not advise Quantlab to retain independent counsel to review these transactions or afford Quantlab an opportunity to do so.  Nor were these transactions in which Dempster acquired his interest fair and reasonable to Quantlab.  Neither did Quantlab consent in writing to these transactions.[7]

---

[6] While a Disciplinary Rule violation does not itself create a private cause of action, "Texas courts have used the Rules as standards for conduct in malpractice and breach of fiduciary duty cases." *In re Pace,* 456 B.R. 253, 280-81 (W.D. San Antonio, May 16, 2011) (*citing Frazin v. Haynes & Boone, LLP (In re Frazin),* 2008 WL 5214036, at *57, 2008 Bankr.LEXIS 2373, at *198 (Bankr.N.D.Tex. Sept. 23, 2008); *see also Sealed Party v. Sealed Party,* 2006 WL 1207732, at *8, 2006 U.S. Dist. LEXIS 28392, at *31 (S.D.Tex. May 4, 2006) (stating that Texas Disciplinary Rules "may be considered evidence and significantly inform the analysis of the scope of fiduciary duties between attorneys and their clients")").  California Courts are in accord. *BGJ Associates v. Wilson* (2003) 113 Cal.App.4th 1217, 1227 ("A violation of the Rules of Professional Conduct subjects an attorney to disciplinary proceedings, but does not in itself provide a basis for civil liability.  But the rules, together with statutes and general principles relating to other fiduciary relationships, all help define the duty component of the fiduciary duty which the attorney owes to his or her client." ); *Mirabito v. Liccardo* (1992) 4 Cal.App.4th 41, 45-46 (Rule 3-300's predecessor used to set standard for attorney's fiduciary duty).

[7] The writing consenting to these transactions must be separate from the transaction papers themselves. *In re Pace,* 456 B.R. at 281-82) (*citing Tai v. Charfoos (In re Charfoos),* 183 B.R. 131, 136–37 (Bankr.E.D.Mich.1994) (applying Michigan's identical Rule 1.8); *In re Estate of Brown,* 930 A.2d 249, 254 (D.C.2007) (applying nearly identical Rule 1.8 and stating that " 'the client's signature on documents evidencing the business transaction cannot be considered 'written consent' under the rule where the client has not been informed of the implications ... of the transaction") (quoting *In re Taylor,* 741 N.E.2d 1239, 1242 (Ind.2001)). *See also Johnson v. Williams,* 2006 WL 1653656, at *7, 2006 Tex.App. LEXIS 5180, at *20–21 (Tex.App.—Houston [1st Dist.] June 15, 2006) (interpreting Rule 1.08 as "stating that an attorney must obtain written consent prior to entering a business transaction with a client")").

41.     Dempster thereafter oversaw the operations of these entities and used them to benefit himself at Quantlab's expense.  For instance, QIP II provided its owners with a vested right to monetize their interests upon the happening of a future capital event.  While that event has not occurred, Dempster, exercising undue influence by virtue of his position of authority and control, and in complete derogation of his fiduciary duties, improperly conspired to and obtained an improper buy-out of his interest, reaping approximately $4 million at Quantlab's expense.  Similarly, with respect to QTPUS, Dempster improperly obtained and retained his interest, receiving over $7 million while actively breaching his fiduciary duties trying to assist Eames and Omeltchenko to wrest management and control of the company away from Quantlab.

42.     These business transactions with Dempster are not fair and reasonable to Quantlab.  Nor did Dempster fully disclose to Quantlab the totality of the terms and conditions of these entities in a manner which could be reasonably understood by Quantlab.  Dempster wholly failed to advise Quantlab to obtain independent counsel to review these transactions and Quantlab's in-house counsel were not given a reasonable opportunity to review or provide advice to Quantlab on these transactions.   Neither did Quantlab consent in writing to the terms of these transactions.  Dempster's acquisition and maintenance of his interest in QTPUS and his acquisition and the buy-out of his interest in QIP II violate his fiduciary duties to Quantlab.  *See, e.g.,* Texas Disciplinary Rules of Professional Conduct Rule 1.08(a).

43.     As a California lawyer, Dempster's conduct is also subject to the California Rules of Professional Conduct.  By entering into QTPUS and QIP II with Quantlab, Dempster violated California Rule 3-300 because: (1) The transactions or acquisitions and their terms were not fair and reasonable to Quantlab and were not fully disclosed and transmitted in writing to Quantlab in a manner which could be reasonably understood; (2) Quantlab was not advised in writing that it

could seek the advice of an independent lawyer of Quantlab's choice and given a reasonable opportunity to seek that advice; and (3) Quantlab did not thereafter consent in writing to the terms of the transaction or the terms of the acquisition. *See, e.g.,* California Rules of Professional Conduct Rule 3-300.

44.     Quantlab Group, LP and Quantlab Financial, LLC are entitled to recover the damages that arise out of Dempster's breaches of fiduciary duty.  Quantlab's damages are substantial and accruing.  Among other things, Quantlab has suffered actual damages resulting directly from Dempster's breaches of his fiduciary duties including the costs of defending the Delaware and Texas State Court Cases, the costs of providing indemnity to the General Partner, the lost profits caused by the delays and interruption in the development and expansion of Quantlab's business, and the damages caused from Dempster's improper business dealings with Quantlab. While certain of Quantlab's damages are quantifiable, the gross violation of trust, disclosure of protected information and confidences, and the destruction of Quantlab's business, reputation, employee morale, and goodwill are not.

45.     Under the egregious circumstances of this case, Dempster's breach is clear and serious.  Dempster should be required to forfeit and disgorge all the fees he and his firm received in connection with the legal and accounting services performed for Quantlab Group, LP, Quantlab Financial, LLC, and the other Quantlab principals and entities.

46.     Dempster's violations of his fiduciary duties require that the business transactions Dempster entered into with Quantlab, namely QTPUS and QIP II, be rescinded and voided, and that Dempster be required to disgorge all profits and funds received from these improper business ventures together with all consequential damages necessary to afford Quantlab complete relief.

47.     Additionally, Dempster's conduct has been willful and malicious with conscious indifference to the rights of Quantlab Group, LP and Quantlab Financial, LLC.  Quantlab Group, LP and Quantlab Financial, LLC are entitled to recover exemplary damages under TEX. CIV. PRAC. & REM. CODE §41.003(a).

## COUNT II – MALPRACTICE

48.     Quantlab repeats and realleges each of the allegations contained in paragraphs 1 through 47 as if set forth fully herein.

49.     Attorneys and accountants owe their clients the duty to act with ordinary care, in a manner consistent with the standard of care that would be expected to be exercised by a reasonably prudent professional.  *Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.,* 284 S.W.3d 416 (Tex.App.—Austin, 2009, no pet.); *University Nat. Bank v. Ernst & Whinney,* 737 S.W.2d 707 (Tex.App.—San Antonio 1989, no writ).

50.     By their conduct, Dempster and Dempster & Dietler, LLP failed to exercise ordinary care in performing legal and accounting services for the Quantlab principals and entities. Among other things, Dempster negligently prepared and misinterpreted agreements in a manner intended to be detrimental to his client, Quantlab, and favorable to Quantlab's adversaries; failed to disclose his conflicts of interest including among his multiple clients and creating the situation that enabled him to betray one set of clients against the other; and failed to properly evaluate and candidly advise Quantlab about the litigation and other risks of which Dempster was aware, including negligently failing to notify and disclose to Quantlab that a secret meeting and attempted *coup* were in the works, despite his professional obligation to be honest and keep his client informed about matters within the scope of his representation.

51.    Dempster is liable to Quantlab for the damages proximately caused by their misconduct and malpractice. *Alexander v. Turter & Associates,* 146 S.W.3d 113 (Tex. 2004). Dempster's actions have proximately caused damages to Quantlab.    Among other things, Quantlab's damages caused by Dempster's malpractice include having to hire attorneys, providing indemnities, and the costs associated with the interruptions and delays in the development and expansion of Quantlab's business.    Moreover, Dempster was actually aware (and perhaps intended) that his conduct involved an extreme risk of harm to Quantlab but he nevertheless proceeded with conscious indifference to Quantlab's rights.    At minimum, the defendants are guilty of gross negligence and are liable to the plaintiffs for exemplary damages in an amount to be determined by the jury.

## COUNT III – FRAUD

52.    Quantlab repeats and realleges each of the allegations contained in paragraphs 1 through 51 as if set forth fully herein.

53.    As Quantlab's longstanding attorney, accountant, advisor, confidant and friend, Dempster had a duty of honesty, candor, and to disclose material facts to Quantlab.  Dempster deliberately failed to disclose such material facts to Quantlab, about which Quantlab was not aware and had no means to discover, to induce Quantlab to refrain from acting.  Quantlab relied on Dempster's non-disclosures incurring severe injuries and damages.  Dempster's conduct amounts to fraud by non-disclosure as set forth by the Texas Supreme Court in *Bombardier Aero. Corp. v. Spep Aircraft Holdings,* No. 17-0578, 2019 WL 406075, at *3 (Tex. February 1, 2019).[8]

---

[8]The Texas Supreme Court listed the elements of fraud by non-disclosure as follows: (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury. Quantlab has plead with particularity the necessary facts demonstrating Dempster's fraud.

54.     Dempster also had a duty to disclose material facts because his partial disclosures created a substantially false impression.  Quantlab did not have the opportunity to discover the truth or the undisclosed facts resulting in severe injury and damage to Quantlab.

55.     It is undisputed that prior to October 31, 2017, while Dempster was Quantlab's current lawyer and on Quantlab's payroll, Dempster intentionally failed to disclose to Quantlab and Dr. Bosarge, as Quantlab's authorized owner/manager, that, among other things: (a) he was secretly meeting with his co-conspirators "for weeks" to devise a scheme to take over the Quantlab businesses; (b) the co-conspirators were actively taking steps to implement their fraudulent take-over scheme, including strategizing and generating the necessary corporate documents needed for the "removal and replacement" of the existing General Partner (Quantlab GP), which was Dempster's actual client, and replacing it with a substitute general partner owned and controlled by the conspirators; (c) a meeting of the "Voting Trust Committee" was being planned and a vote to be taken where Mr. Eames, as the 25% owner, would take away control of the Quantlab business from Dr. Bosarge, the 75% owner, and that Dempster was to be appointed as the "Voting Trustee" to cast the vote to make it happen; (d) he was an integral part of the cabal and actively conspiring with his co-conspirator's outside counsel to defraud his client by helping orchestrate the *coup*; and (e) he was anticipating litigation against his own client as early as October 8, 2017. While Dempster disclosed that he was resigning on October 31, 2017, he failed to disclose that he was secretly working with his co-conspirators against Quantlab both before and after his resignation. *See also* paragraph 24, above.

56.     Dempster, as Quantlab's actual attorney, owed fiduciary duties to Quantlab, including the duties of absolute perfect candor, openness and honesty, and the absence of concealment or deception.  Dempster had a duty to disclose all material facts concerning

Quantlab's businesses, particularly the facts listed above, to Quantlab, and to Dr. Bosarge, Quantlab's authorized manager and owner. Dempster remained deliberately silent when he had a duty to Quantlab to speak.

57.     It is undisputed that Quantlab did not know and had no opportunity to discover the secret meetings, the conspiracy to defraud it, the impending *coup*, and the conspirators' breaches of duties until the Delaware I lawsuit was filed and served on Quantlab by none other than Dempster himself. Dempster's intent to harm Quantlab by his egregious conduct, fraud, and violations of duty is evidenced, in part, by his extensive efforts in planning and assisting in the development and implementation of the *coup*, his intentional deception in keeping his and his conspirators' wrongdoings secret when he had a duty to tell Quantlab, and his expressed satisfaction in injuring his client.

58.     Dempster and his conspirators intentionally kept Quantlab and Dr. Bosarge in the dark about their *coup* because they knew that Quantlab would have exercised its contractual rights under the Quantlab GP LLC Agreement to thwart the *coup* before it could have occurred.  On November 6, 2017, hours after learning of the *coup*, Quantlab removed Eames as a manager of Quantlab GP by written consent of the majority member.  Had Dempster not been part of the conspiracy to defraud Quantlab and, instead, honored his fiduciary duties by providing full disclosure of the plot to Quantlab, Eames would have been removed as a manager before the *coup* occurred.  By removing Eames as manager, he would not have had any authority to even attempt to admit a new general partner (Quantlab GP II) to take over Quantlab's businesses.  Dempster's failure to disclose prevented Quantlab from blocking the *coup* and avoiding the related litigation.

59.     Quantlab's reliance on Dempster's deception prevented it from stopping the *coup*. The Delaware I, Delaware II, Texas I, and Texas II Cases, as well as the present litigation, were

the direct result of the *coup*.  Quantlab has expended significant sums in connection with these cases.  Quantlab has also been injured as a result of the disruption of Quantlab's business, the destruction of its reputation, the impairment of its recruiting efforts, the raiding of its talent, and the invasion of and wrongful dissemination of its privileged and confidential information, caused by Dempster's fraud.

60.     Dempster is liable to Quantlab for the damages caused by his fraud.  Pursuant to Tex. Civ. Prac. & Rem. Code §41.003(a)(1), Quantlab also seeks and is entitled to recover exemplary damages against Dempster in an amount to be determined by the trier of fact in this case.

## INJUNCTIVE RELIEF

61.     Quantlab repeats and realleges each of the allegations contained in paragraphs 1 through 60 as if set forth fully herein.

62.     Notwithstanding reasonable efforts to get him to stop, Dempster continues his active advice, counsel, support and encouragement of Eames and Omeltchenko in their war for control of the Quantlab entities.  Dempster apparently has no regard for his fiduciary duties to Quantlab Group, LP and Quantlab Financial, LLC, or the other Quantlab principals and entities he represented and advised.  Nor does he show any regard to his obligation not to use or disclose the confidential information he acquired during his Quantlab engagements.  While Dempster's conduct has caused substantial financial damage to Quantlab, other elements of damage are intangible and difficult to quantify with certainty.  As Dempster's unlawful activities continue to occur the damage to Quantlab continues to accrue.  Unless he is required to stop, Quantlab will be faced with significant irreparable injury for which there is no adequate remedy at law.  Quantlab Group, LP and Quantlab Financial, LLC respectfully ask for preliminary and permanent injunctive

relief prohibiting the defendants from continuing to communicate, consult, advise or counsel, as a legal or accounting advisor or otherwise, Messrs. Eames and Omeltchenko and their affiliated entities and anyone acting in concert with any of them on matters related to the matters regarding which they previously advised Quantlab and its principals.

63.     While Dempster has entered into an agreed order prohibiting certain activities, Quantlab is entitled to a Permanent Injunction prohibiting Dempster from continuing to violate his fiduciary and ethical duties to Quantlab.

## DISCOVERY RULE

64.     Despite its diligence, Quantlab did not know and could not have discovered its injuries caused by Dempster, and Dempster's breaches of fiduciary duties and malpractice until 2018 and fraud until recently.  Alternatively, the applicable limitations periods are tolled.  Among other things, Dempster fraudulently concealed his malpractice, breaches of duties and fraud, and Quantlab, despite the exercise of due diligence, did not discover the facts that form the bases of these claims until well within the applicable limitations periods for each such cause of action.

## JURY DEMAND

65.     Plaintiff demands a trial by jury and tenders the appropriate fee.

For the foregoing reasons, Quantlab Group, LP and Quantlab Financial, LLC respectfully request that Allen Herman Dempster and Dempster & Dietler, LLP be cited to appear and answer; that the court issue preliminary and permanent injunctions prohibiting the defendants from continuing to communicate, consult, advise or counsel, as a legal or accounting advisor or otherwise, Messrs. Eames and Omeltchenko, or any of their affiliated persons or entities, including attorneys, or anyone acting in concert with any of them on matters related to the matters regarding which they previously advised Quantlab and its principals; that Dempster and Dempster & Dietler,

LLP be required to disgorge all of the fees they received in connection with the legal and accounting services performed for Quantlab Group, LP, Quantlab Financial, LLC, and the other Quantlab principals and entities; that the transactions Dempster entered into with Quantlab, namely QTP US and QIP II, be rescinded and voided, and that Dempster be required to disgorge all profits and funds received from these improper business ventures together with all consequential damages necessary to afford Quantlab complete relief; that Quantlab Group, LP and Quantlab Financial, LLC recover a judgment against Dempster and Dempster & Dietler, LLP for breach of fiduciary duty, legal malpractice and fraud in an amount to be proven at trial, but in excess of ten million dollars ($10,000,000.00); that Quantlab recover exemplary damages in an amount to be determined by the jury; that Quantlab recover all costs; and that Quantlab recover such other and further relief to which it may be justly entitled.

Respectfully submitted,

TOM ALAN CUNNINGHAM PLLC

By:    /s/Tom Alan Cunningham
       Tom Alan Cunningham
       Texas Bar No. 05244700
       tac@tomalancunningham.com
       919 Milam, Suite 575
       Houston, TX  77002
       Telephone:  713-255-5500
       Fax:  713-255-5555

ATTORNEY FOR PLAINTIFFS
QUANTLAB GROUP, LP and
QUANTLAB FINANCIAL, LLC

OF COUNSEL:

Debbie C. Darlow
Texas Bar No. 05186900
Email:  ddarlow@tomalancunningham.com
TOM ALAN CUNNINGHAM PLLC
919 Milam, Ste. 575
Houston, Texas 77002
Tel:  713-255-5500
Fax  713-255-5555